807 N.E.2d 472 (2004)
209 Ill.2d 287
282 Ill.Dec. 848
In re D.C. et. al., Minors (The People of the State of Illinois, Appellant,
v.
Tontorya C., Appellee).
No. 95841.
Supreme Court of Illinois.
March 18, 2004.
*473 Lisa Madigan, Attorney General, Springfield, and Kevin W. Lyons, State's Attorney, Peoria (Gary Feinerman, Solicitor General, Linda D. Woloshin and Michael M. Glick, Assistant Attorneys General, Chicago, and Norbert J. Goetten, John X. Breslin and Gary F. Gnidovec, Office of the State's Attorneys Appellate Prosecutor, Ottawa, of counsel), for the People.
Dana M. Kelly, Peoria, for appellee.
Chief Justice McMORROW delivered the opinion of the court:
In this appeal we consider whether a court may find a parent unfit pursuant to section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2000)), with regard to a minor who was born within the statutory nine-month period used to assess the parent's fitness as to other children. In the case at bar, the Peoria County circuit court found that respondent, Tontorya C., failed to make reasonable progress toward the return of her children during the nine-month period between November 1, 2000, and July 31, 2001. Based on that finding, the court ruled Tontorya an unfit parent pursuant to section 1(D)(m)(iii) and terminated her parental rights as to all four of her children, including P.C., who was born on January 20, 2001. In an unpublished order, the appellate court affirmed the finding of unfitness and termination of parental rights as to Tontorya's three older children, but reversed as to P.C. No. 3-02-0408 (unpublished order under Supreme Court Rule 23). The State now argues that where, as here, a parent has been shown to be unfit because the parent failed to make reasonable progress toward the return of her children during a particular nine-month period, the parent is unfit as to all of her children, including one who was born within the nine-month statutory period used to determine parental fitness.
We allowed the State's petition for leave to appeal (177 Ill.2d R. 315) and now affirm the judgment of the appellate court.

BACKGROUND
On June 7, 1999, 20-year-old Tontorya C. and her three daughters, 3½-year-old D.C. (born December 10, 1995); 22-month-old E.A. (born August 13, 1997); and 10-month-old I.A. (born August 22, 1998), came to the attention of the Department of Children and Family Services (DCFS) as a result of a call made to the child abuse hot line by Peoria police. The police reported that they had responded that day to a call about a domestic dispute at Tontorya's residence. When officers arrived on the scene, they found that Earnest A., Tontorya's paramour and the putative father of E.A. and I.A., had locked Tontorya out of her residence after beating her because she would not get him money to buy more cannabis. Once the police gained entry into the residence, they found the home in the following condition: "bad odor throughout the home, piles of trash and dirty clothes throughout, kitchen counter and sink were filthy and dirty dishes piled up, only two lights worked in the entire house, the toilet had feces floating in it and the toilet and tub upstairs were filthy, filthy mattresses on the floor, a child's potty seat with feces in it, the kitchen table had a plate of cannabis on it *474 that had been there for a week, the refrigerator was filthy and had only a small amount of food and milk in it, the minors and mother were filthy and there was a `porta-potty' that had been inside the apartment for more than a year, filled with urine and feces." Earnest was arrested on charges of domestic battery and possession of a controlled substance,[1] Tontorya was arrested on charges of endangering the welfare of her children, and the children were placed with Tontorya's mother, Sharon Brown.
On June 30, 1999, DCFS filed a petition in the Peoria County circuit court alleging that D.C., E.A., and I.A. were neglected minors because their home environment was injurious as a result of domestic violence and filthy living conditions. A preliminary hearing was held on July 2, 1999, at which time the court ordered that the children were to remain with the maternal grandmother under an order of protection which prohibited Tontorya and Earnest from: having any contact with the children unless authorized and supervised by DCFS; living in the same residence with the children; or staying in that residence overnight.
At the adjudicatory hearing on August 6, 1999, Tontorya admitted the allegations of neglect in open court and D.C., E.A., and I.A. were adjudicated neglected minors.[2] A dispositional hearing was held on October 15,1999, at which time D.C., E.A., and I.A. were made wards of the court with DCFS as their guardian. The three children remained with the maternal grandmother until October 2000, when they were moved to a foster home after it was discovered that the children had high levels of lead in their systems due to exposure to lead at the Brown residence. In September 2000, Tontorya finally found stable housing suitable for both her and the children. However, return of the children was not possible. Tontorya, who was then pregnant with a fourth child, had difficulty controlling her children during supervised visits and failed to keep the apartment clean and safe. In addition, despite the fact that Tontorya had obtained an order of protection against Earnest, she had regular contact with him punctuated by several incidents of violence.
On January 20, 2001, Tontorya gave birth to a fourth daughter, P.C.[3] DCFS took P.C. into protective custody on January 23, 2001, and placed her in foster care. On January 25, 2001, DCFS filed a neglect petition alleging P.C. to be in substantial risk of physical harm due to the fact that her siblings were already under the guardianship of DCFS as a result of neglect by Tontorya, and that Tontorya had not made sufficient efforts or progress to allow for the return of those children. That same day, the court issued a temporary shelter care order placing P.C. in the temporary custody of DCFS. On February 16, 2001, Tontorya admitted in court the allegations *475 of neglect contained in the State's petition concerning P.C. and the court found P.C. to be a neglected minor. At a May 18, 2001, dispositional hearing, P.C. was made a ward of the court with DCFS as her guardian.
Although Tontorya made some initial efforts to comply with service plan requirements by attending parenting classes and domestic violence counseling, she made no behavioral changes. Tontorya failed to keep herself or her apartment clean. More importantly, despite repeated episodes of abuse, Tontorya did not sever ties to Earnest. In addition, Tontorya lied about her involvement with Earnest to DCFS and the supervising agency, Catholic Social Services (CSS), and her cooperation with these agencies steadily declined. Consequently, on September 18, 2001, DCFS filed a petition to terminate Tontorya's parental rights to her four children, alleging in a single count that Tontorya was an unfit parent as defined by section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2000)), because she failed to make reasonable progress toward the return of her children during the nine-month period beginning November 1, 2000, and ending July 31, 2001.[4]
The hearing to determine Tontorya's parental fitness commenced on January 30, 2002, and was completed on March 19, 2002. The court took judicial notice of the following documentary evidence: the neglect petition filed on June 30, 1999, with respect to D.C., E.A., and I.A.; the order of protection dated July 2, 1999; the adjudication order dated August 6, 1999; the dispositional order dated October 15, 1999; permanency orders dated January 28, 2000, September 1, 2000, November 3, 2000, and May 18, 2001; the neglect petition with respect to P.C., dated January 25, 2001; the adjudication order regarding P.C., dated April 27, 2001; and the dispositional order with regard to P.C., dated May 18, 2001. The court also received into evidence the following: a copy of Tontorya's psychological evaluation; a copy of the order of protection against Earnest; a certified copy of Tontorya's counseling records from Catholic Social Services; and a certified copy of Tontorya's records from the Human Services Center. The court then heard testimony concerning Tontorya's conduct during the period of November 1, 2000, to July 31, 2001.
On March 19, 2002, at the close of the hearing, the court issued a finding that Tontorya had been proven unfit by clear and convincing evidence that she failed to make reasonable progress during the November 1, 2000, to July 31, 2001, period. At the best interests hearing held on May 8, 2002, the court concluded that it was in the best interests of D.C., E.A., I.A., and P.C. to terminate Tontorya's parental rights to them.
As noted earlier, the appellate court reviewed the matter and upheld the finding of unfitness and termination of parental rights as to D.C, E.A. and I.A., but reversed with regard to P.C., finding that "the [trial] court could not have determined that respondent failed to make reasonable progress toward the return of P.C. during the nine-month period."
The State filed a petition for leave to appeal, which this court allowed. 177 Ill.2d R. 315. No cross-appeal has been filed and, thus, no challenge has been made to that part of the appellate court judgment which affirms the finding of Tontorya's *476 unfitness and termination of her parental rights as to D.C., E.A. and I.A.,

ANALYSIS
A natural parent's right to raise his or her child is a basic fundamental liberty interest and, thus, a proceeding to involuntarily terminate a parent's rights is a drastic measure. See In re Tekela, 202 Ill.2d 282, 285, 269 Ill.Dec. 119, 780 N.E.2d 304 (2002); In re D.D., 196 Ill.2d 405, 417, 256 Ill.Dec. 870, 752 N.E.2d 1112 (2001); In re Paul, 101 Ill.2d 345, 354-55, 78 Ill. Dec. 149, 461 N.E.2d 983 (1984). In Illinois, a court's authority to involuntarily terminate parental rights and to appoint a guardian with the right to consent to adoption is statutorily derived and the scope of the court's authority is defined by the language of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 2002)) and the Adoption Act (750 ILCS 50/0.01 et seq. (West 2002)). In re D.F., 201 Ill.2d 476, 494-95, 268 Ill.Dec. 7, 777 N.E.2d 930 (2002); In re M.M., 156 Ill.2d 53, 66, 189 Ill.Dec. 1, 619 N.E.2d 702 (1993). Pursuant to sections 2-13 and 2-29 of the Juvenile Court Act, termination proceedings may be initiated by the filing of a petition brought "in the interest of and on behalf of an abused, neglected or dependent minor at any time after a dispositional order has been entered pursuant to section 2-22. 705 ILCS 405/2-13, 2-29 (West 2002). Although the Juvenile Court Act does not so state, it is well established that a termination petition brought pursuant to section 2-29 must contain an allegation that the parent is unfit, as well as the specific statutory grounds for charging the parent with unfitness. See In re Dragoo, 96 Ill. App.3d 1104, 1107, 52 Ill.Dec. 582, 422 N.E.2d 263 (1981) ("the combined effect of section 9.1-5(B)(j) of the Adoption Act (Ill. Rev.Stat.1975, ch. 4, par. 9.1-5(B)(j)) and section 5-9 of the Juvenile Court Act (Ill. Rev.Stat.1975, ch. 37, par. 705-9) was to require a petition for the foregoing relief to allege that any nonconsenting parent was `an unfit parent' and to set forth `the ground therefore' as provided in section 9.1-5(B)(j) of the Adoption Act although the Juvenile Court Act had no express provision so stating"); In re Westland, 48 Ill.App.3d 172, 177, 6 Ill.Dec. 331, 362 N.E.2d 1153 (1977) (same); In re Rauch, 45 Ill.App.3d 784, 789, 4 Ill.Dec. 61, 359 N.E.2d 894 (1977) (same).
When a termination petition has been filed, the trial court must first decide whether any of the statutory grounds for unfitness alleged in the petition has been proven by clear and convincing evidence. 705 ILCS 405/2-29(4) (West 2000); 750 ILCS 50/1(D) (West 2000). A court may not terminate a parent's rights on grounds not charged in the petition. See In re C.M., 305 Ill.App.3d 154, 238 Ill.Dec. 422, 711 N.E.2d 809 (1999) (trial court improperly forced the evidence relating to lack of discipline to fit the legal theory before it); In re S.G., 216 Ill.App.3d 668, 159 Ill.Dec. 125, 575 N.E.2d 932 (1991) (trial court's termination of parent's rights could not be affirmed when it was based on grounds which were originally uncharged and which the parent had no reason to know could be the basis for the removal of the children). However, every alleged ground for finding a parent unfit need not be proven. A parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence. In re D.L., 191 Ill.2d 1, 8, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000); In re D.D., 196 Ill.2d at 422, 256 Ill.Dec. 870, 752 N.E.2d 1112.
If the court finds that at least one of the several discrete grounds for finding a person "unfit," as set forth in section 1(D) of the Adoption Act, has been proven by clear and convincing evidence, the court *477 may then consider whether termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29 (West 2002); 750 ILCS 50/1(D) (West 2002); In re D.F., 201 Ill.2d 476, 495, 268 Ill.Dec. 7, 777 N.E.2d 930 (2002) (a two-step process is mandated; the best interests of the child may be considered only after a finding of unfitness has been made).
In the case at bar, the State filed a petition in the name of all four of Tontorya's children, each having been previously adjudged neglected and made a ward of the court. In a single count, the State alleged:
"Tontorya [C.] is an unfit person as that term is defined in Illinois Compiled Statutes, Chapter 750, Section 50/1(D)(m)(iii), in that she has failed to make reasonable progress toward the return of the minors to the parent during any nine month period after the initial nine month period, with this nine month period ending July 31, 2001, following the adjudication of a neglected, abused or dependent minor."
Section 1(D)(m)(iii) is one of three distinct grounds for finding a person unfit contained within section 1(D)(m) of the Adoption Act. See In re D.F., 208 Ill.2d 223, 280 Ill.Dec. 549, 802 N.E.2d 800 (2003) (when section 1(D)(m) was amended by Public Act 91-373, a third possible ground for unfitness was added effective January 1, 2000). The three possible grounds are: (i) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child; (ii) failure to make reasonable progress toward the return of the child within nine months of the adjudication of the child as abused, neglected or dependent; and (iii) failure to make reasonable progress toward the return of the child during any nine-month period after the end of the initial nine-month period following the adjudication of the child as abused, neglected, or dependent. 750 ILCS 50/1(D)(m) (West 2002). In the case at bar, the State alleged the third ground as the basis for finding Tontorya unfit as to all of her children and chose November 1, 2000, through July 31, 2001, as the relevant "9-month period after the end of the initial 9-month period following the adjudication."
The record shows that Tontorya's first three children, D.C., E.A., and I.A., were adjudicated neglected on August 6, 1999. Clearly, then, as to D.C., E.A., and I.A., the period of November 1, 2000, through July 31, 2001, qualifies as a "9-month period after the end of the initial 9-month period following the adjudication." Thus, the court, after determining that there was clear and convincing evidence that Tontorya failed to make reasonable progress toward the return of D.C., E.A., and I.A. during this nine-month period, could properly rule Tontorya unfit as to these three children.
P.C., however, was not born until January 20, 2001, and was not adjudicated neglected until April 27, 2001. Thus, the nine-month period from November 1, 2000, to July 31, 2001, is not, with respect to P.C., a "9-month period after the end of the initial 9-month period following the adjudication." The period chosen by the State to establish Tontorya's unfitness encompasses only three months of the initial nine-month period after P.C.'s adjudication.
The question we must answer is one of first impression: whether a parent's rights may be terminated as to all of her children based on a finding that the parent is unfit pursuant to section 1(D)(m)(iii), when the statutory nine-month period chosen by the State to demonstrate the parent's unfitness is a "9-month period after the end of the initial 9-month period following the adjudication" with respect to *478 some, but not all, of the children. Because this issue is one of statutory construction, our review is de novo. See In re D.F., 208 Ill.2d 223, 280 Ill.Dec. 549, 802 N.E.2d 800; In re D.D., 196 Ill.2d 405, 418, 256 Ill.Dec. 870, 752 N.E.2d 1112 (2001). When construing a statute, we are to ascertain and give effect to the intent of the legislature, relying foremost on the language of the statute, which is the most reliable indicator of legislative intent. In re D.D., 196 Ill.2d at 418-19, 256 Ill.Dec. 870, 752 N.E.2d 1112.
It is the State's position that, when construing section 1(D)(m)(iii), we should not be constrained by its literal language. Relying on comments made during committee discussions in the Illinois House of Representatives, the State concludes that the legislative purpose for adding paragraph (iii) to section 1(D)(m) was to speed up the process of finding permanent placements for children. The State claims that it would not only be contrary to this legislative intent but also inconsistent with relevant case law for this court to hold that evidence which supports a finding that a parent is unfit as to some children may not serve as the basis for terminating that parent's rights to all of her children, "even when the supporting evidence relates to events occurring prior to the birth of some of the children." According to the State, to read section 1(D)(m)(iii) as requiring a separate "9-month period after the end of the initial 9-month period following the adjudication" with reference to each child, would be "overly formalistic" and "absurd," particularly where, as in the case at bar, there is overwhelming evidence that the parent will never be able to provide a safe and nurturing living environment for any of her children. According to the State, unfitness as to one child is unfitness as to all.
As support for its interpretation of section 1(D)(m)(iii), the State calls our attention to our recent opinion in In re D.F., 201 Ill.2d 476, 500-01, 268 Ill.Dec. 7, 777 N.E.2d 930 (2002), wherein we concluded that "depending on the type of neglect alleged, evidence of neglect toward one child may be relevant to the question of a parent's fitness with respect to another child." The State also relies on several appellate court decisions (In re G.V., 292 Ill.App.3d 301, 307, 226 Ill.Dec. 303, 685 N.E.2d 406 (1997), In re S.H., 284 Ill. App.3d 392, 400, 219 Ill.Dec. 895, 672 N.E.2d 403 (1996), In re Henry, 175 Ill. App.3d 778, 792-93, 125 Ill.Dec. 413, 530 N.E.2d 571 (1988), and In re J.R., 130 Ill.App.3d 6, 9, 85 Ill.Dec. 410, 473 N.E.2d 1009 (1985)), in which the appellate court held that "evidence supporting a parent's unfitness toward some children may serve as the basis for termination of parental rights toward all of that party's children, even where that evidence relates to events occurring prior to the birth of some children." While we agree with the general propositions for which the above-cited cases stand, we find them to be factually distinguishable, and the State's reliance on them misplaced.
Initially, we note that in none of the cases cited above was it held that a parent did not have to be found unfit, in compliance with section 1(D) of the Adoption Act, as to each child. To the extent that In re J.R. might be interpreted as so holding, we overrule it. What the above-cited cases hold is that, when deciding a parent's fitness as to a particular child, the court may find relevant evidence of that parent's neglect toward his or her other children and, depending on the ground for unfitness alleged, evidence of the neglect or abuse of the other child or children may be sufficient to support the finding of unfitness as to the particular child. This *479 may be so even when the particular child was born after the occurrences of neglect or abuse toward the other child or children. Nevertheless, it is always necessary to find, by clear and convincing evidence, that the parent is unfit with respect to each child, based on some ground set forth in section 1(D) of the Adoption Act.
This concept is clearly shown by our decision in In re D.F., 201 Ill.2d 476, 268 Ill.Dec. 7, 777 N.E.2d 930 (2002). In In re D.F., the trial court found the respondent-mother unfit as to her three children due to "substantial neglect" (see 750 ILCS 50/1(D)(d) (West 2002)) and relied on several factors, including one child's diagnosed "non-organic failure to thrive" syndrome. Respondent argued on appeal that the one child's "failure to thrive" could not be considered when determining whether her other two children were "substantially neglected." We disagreed, holding that evidence of neglect toward one child may be relevant in deciding a person's unfitness with respect to other children. In re D.F., 201 Ill.2d at 500-01, 268 Ill.Dec. 7, 777 N.E.2d 930. Nevertheless, this court then went on to determine whether there was sufficient evidence to support a finding of substantial neglect as to each child. We held that, even when barring evidence of D.F.'s failure to thrive, the trial court's determination of continuous and substantial neglect with respect to E.K. and T.K. was not against the manifest weight of the evidence. In re D.F., 201 Ill.2d at 502, 268 Ill.Dec. 7, 777 N.E.2d 930. Further, we held, "As to D.F., even if the other grounds affecting her sisters are not considered, her failure to thrive combined with the horrendous conditions of the home could be deemed substantial neglect." In re D.F., 201 Ill.2d at 502-03, 268 Ill.Dec. 7, 777 N.E.2d 930.
We note, too, that in the case at bar, unlike the cases cited by the State, the ground for unfitness references a particular time period relative to the determination of unfitness. In In re D.L., 191 Ill.2d 1, 11, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000), we held that the inclusion of a time period was significant, stating:
"The varying presence and absence of time periods in the provisions under section 1(D) demonstrates to us that the legislature believed that, for purposes of establishing certain allegations of unfitness, a parent's conduct during a specified period of time would be relevant."
In the case at bar, the State alleged that Tontorya was an unfit person pursuant to section 1(D)(m)(iii), which requires a showing that Tontorya failed "to make reasonable progress toward the return of the child to the parent during any nine month period after the end of the initial nine month period following the adjudication of neglected or abused minor." As explained earlier, because P.C. was not adjudicated neglected until April 27, 2001, the nine-month period chosen by the State to demonstrate Tontorya's unfitness, i.e., November 1, 2000, to July 31, 2001, was not, with respect to P.C., a "9-month period after the end of the initial 9-month period following the adjudication." Nor did the trial court consider evidence corresponding to "any 9-month period after the end of the initial 9-month period following the adjudication" with respect to P.C. Thus, the trial court could not have found, by clear and convincing evidence, that the allegation of unfitness was proven with respect to P.C. See In re R.E., 315 Ill.App.3d 944, 248 Ill.Dec. 850, 735 N.E.2d 170 (2000).
We can find no authority for ignoring the plain language of the statute here. We conclude that courts, when deciding whether a person is unfit under section 1(D)(m)(iii), are required to find clear and convincing evidence of a lack of reasonable progress during the applicable time period *480 with respect to each child. See In re E.B., 313 Ill.App.3d 672, 674, 246 Ill.Dec. 592, 730 N.E.2d 617 (2000). We do not agree with the State that adherence to the literal language of the statute would be demonstrably at odds with legislative intent. Although the State's expansive interpretation of the statute would "speed up the process" of adoption, expediency is not our only concern. We are mindful that termination of parental rights is an extraordinary measure. Thus, when conducting such proceedings, it is not simple logic, but the literal language of the statute that must control. See In re Y.B., 285 Ill. App.3d 385, 390, 221 Ill.Dec. 26, 674 N.E.2d 819 (1996).

CONCLUSION
For the reasons stated above, we affirm the appellate court's reversal of the trial court's finding of unfitness and termination of Tontorya's parental rights with respect to P.C.
Appellate court judgment affirmed.
NOTES
[1] Earnest's arrest on June 7, 1999, was not his first arrest for domestic violence. Police records indicated that Earnest A. was previously arrested on July 30, 1996, and July 19, 1997, for domestic battery involving Tontorya. Earnest also had a prior arrest for possession of a controlled substance on January 18, 1996.
[2] Earnest, the putative father of E.A. and I.A., was served with process, but he never attended this court hearing or any other subsequent hearing concerning his children. Philip W., the putative father of D.C., was not served. He was believed to be living somewhere in Arkansas and had not had any contact with Tontorya or D.C. for a long time.
[3] Tontorya initially refused to name the father of the child, but later claimed that the father of this child was Tommy C., who, she said, wanted nothing to do with the child and threatened her with bodily harm if DCFS ever contacted him.
[4] The petition also sought to terminate the parental rights of the putative fathers: Earnest A., with respect to E.A. and I.A.; Philip W., with respect to D.C.; and Tommy C., with respect to P.C. It was alleged that the fathers failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor children.