NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260206-U

NO. 4-26-0206

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 16, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 23JA63 |
| v. | ) | |
| Dakiyah F., | ) | Honorable |
| Respondent-Appellant). | ) | Chad M. Long, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted counsel's motion to withdraw and affirmed the trial
court's judgment, concluding no issue of arguable merit could be raised on appeal.

¶ 2    In October 2025, the State filed a petition to terminate the parental rights of

respondent, Dakiyah F., to her minor child, K.F. (born February 2023). Following the fitness and

best interest hearings, the trial court granted the petition and terminated respondent's parental

rights. (The court also terminated the parental rights of K.F.'s father, Reginald C., who is not a

party to this appeal.) Respondent appealed and counsel was appointed to represent her. Counsel

now moves to withdraw, citing *Anders v. California*, 386 U.S. 738 (1967), on the basis that "an

appeal in this case would be frivolous." See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (holding

*Anders* applies to termination of parental rights cases). We agree and grant counsel's motion to

withdraw and affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4        On October 20, 2023, the State filed a petition for adjudication of wardship, alleging K.F. was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The petition contained the following allegations about respondent:

"2. On August 14, 2023, Office[r] [James] Kubis of the Galesburg Police Department took a complaint from Maurice S[.] that his two-year-old daughter, M.S., had been battered by her babysitter, [respondent]. The two-year-old had marks and bruises all over her body after being in the care of [respondent].

3. Upon the mother of [M.S.] questioning [respondent] about the marks and bruises, she responded through text messages by saying that [M.S.] had knocked her baby off the bed, so she slapped her and hit her in the face and further said, 'the only thing I did was whoop her' and 'she got her ass beat.'

4. [M.S.] was taken to the Pediatric Resource Center *** and evaluated by Dr. Shilpa Hari. The medical opinion by Dr. Shilpa Hari was that [M.S.] had patterned scars and marks that were consistent with child physical abuse and inflicted injury.

5. As a result of these injuries to [M.S.] and the fact that [K.F.] had been pulled off the bed by [M.S.] while in [respondent's] care, Child Protection Worker [(CPW)] Ashleigh Ruark requested that [respondent] take [K.F.] to the Pediatric Resource Center for a medical examination due to the potential risk of harm to [K.F.] Despite being reminded by CPW Rurak approximately ten (10) times, [respondent] would not take [K.F.] to the Pediatric Resource Center for the

examination.

6. In addition, [respondent] failed to take [K.F.] to her regular medical appointment at [K.F.'s] pediatrician's office on October 5, 2023.

7. Further, [respondent] has a prior Indicated Report for Inadequate Supervision which was indicated on May 15, 2023 for an incident with her nieces while they were in her care."

The State did not request a shelter care hearing.

¶ 5 The trial court held a first appearance on the State's petition on October 24, 2023. At the hearing, the court admonished respondent as to the allegations in the State's petition and her rights under the Juvenile Court Act and appointed counsel to represent her. The court also ordered respondent to take K.F. to the Pediatric Resource Center for a physical examination.

¶ 6 At the next court appearance, the trial court noted respondent had taken K.F. to the Pediatric Resource Center and the doctor's report indicated there were "no indicia of trauma." The court then continued the case to allow the State to serve Reginald C. with a copy of the petition for adjudication of wardship.

¶ 7 On February 13, 2024, the parties advised the trial court that respondent had agreed to stipulate to the allegations in the State's petition for adjudication and the parties agreed respondent and Reginald C. would be placed on supervision for one year. Prior to accepting their stipulations, the court admonished respondent and Reginald C. as to the requirements of supervision, and both indicated they understood. The court then confirmed respondent was not under the influence of any alcohol, drugs, or prescribed medication and had not been forced or threatened to stipulate to the allegations in the petition. Following this colloquy, the court accepted the parties' agreement and entered an order of continuance under supervision.

¶ 8          In August 2024, the State filed a petition to revoke respondent's supervision and a motion to have K.F. placed in the temporary custody of the Illinois Department of Children and Family Services (DCFS). In the petition to revoke respondent's supervision, the State alleged respondent failed to complete any of her required services and "[was] not complying with home visits by the agency."

¶ 9          The trial court held a shelter care hearing on August 29, 2024. Respondent was not present at the hearing. However, her attorney was present. Following testimony from the child welfare specialist assigned to K.F.'s case, the court found (1) there was probable cause for the State's petition, (2) there was an immediate and urgent necessity to remove K.F. from respondent's custody, and (3) reasonable efforts were made to keep K.F. in respondent's custody, but those efforts did not eliminate the need for K.F.'s removal. The court granted temporary custody and guardianship of K.F. to DCFS.

¶ 10          Respondent appeared at the next scheduled court date in September 2024. At that hearing, the trial court admonished her as to the allegations in the State's petition to revoke her supervision and her rights under the Juvenile Court Act. Respondent indicated she understood the allegations and her rights. The court then continued the case to allow the State to serve Reginald C. with a copy of the petition to revoke and motion to have K.F. placed in temporary custody.

¶ 11          On December 12, 2024, the parties informed the trial court that respondent would stipulate to the allegations contained in the State's petition to revoke supervision. Based on respondent's stipulation and the State's proffered factual basis, the court entered an adjudicatory order, which found K.F. was a neglected minor based on respondent's prior stipulation to the petition for adjudication and her stipulation to the petition to revoke supervision. The case was then set for a dispositional hearing.

¶ 12　　　　The trial court held a dispositional hearing on February 25, 2025. Respondent failed to appear at the hearing. DCFS filed a dispositional report for the court's consideration. After hearing arguments from the parties, the court found respondent was unfit "to care for, protect, train, educate, supervise or discipline [K.F.] and placement with [respondent] is contrary to the best interests of [K.F.]" Based on these findings, the court made K.F. a ward of the court and continued custody and guardianship with DCFS.

¶ 13　　　　On October 6, 2025, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent was an unfit parent in that:

> "a. She has failed to make reasonable efforts to correct the conditions which were the basis for removal of [K.F.] from parental custody within any 9 month period after an adjudication of Neglect; specifically, December 30, 2024 to September 30, 2025 (750 ILCS 50/1D(m)(i) [(West 2024)]).
>
> b. She has failed to make reasonable progress toward the return of [K.F.] to parental custody within any 9 month period after an adjudication of neglect; specifically, December 30, 2024 to September 30, 2025 (750 ILCS 50/1D(m)(ii) [(West 2024)]).
>
> c. She has failed to maintain a reasonable degree of interest, concern, or responsibility as to [K.F.'s] welfare (750 ILCS 50/1D(b) [(West 2024)])."

(We note the State filed an amended petition to terminate respondent's parental rights. However, the allegations remained the same in the amended petition.) The trial court conducted a fitness hearing on January 8, 2026.

¶ 14　　　　　　　　　　　　　A. Fitness Hearing

¶ 15　　　　At the hearing, all parties waived opening statements. The State then called Dan

Powell as a witness.

¶ 16                              1. *Testimony of Powell*

¶ 17        Powell, a caseworker for DCFS, was assigned to respondent's case. In order to have K.F. returned to her care, respondent was required to complete the following services: a mental health assessment, counseling, a domestic violence education course, and a parenting education course. Additionally, she had to submit to regular drug screens, maintain appropriate housing, cooperate with DCFS, and attend visitation. Powell noted respondent was cooperative with the agency but had issues with engagement in some services.

¶ 18        During the relevant nine-month period, respondent maintained appropriate housing and completed a substance abuse assessment, which recommended no treatment. Respondent also reported having employment. However, Powell never received any employment verification. Respondent completed a mental health assessment but refused to participate in the recommended counseling. According to Powell, respondent failed to attend a domestic violence education course and never completed any drug screens. Additionally, respondent was removed from the parenting education course multiple times due to nonattendance. With respect to visitation with K.F., respondent frequently missed visits and canceled at the last second. The visit aide also noted respondent had issues with attentiveness during visits. When respondent attended visits, she would frequently bring clothing for K.F. and prepare meals.

¶ 19        On cross-examination by respondent's counsel, Powell acknowledged respondent "was engaged in some of the services at different levels of engagement" during the relevant nine-month period. Respondent did eventually complete the parenting education course. However, she completed it after the relevant nine-month period. Powell agreed respondent told him she had issues with transportation, but Powell asserted he provided her with bus passes to attend services.

Respondent's visitation with K.F. occurred at respondent's home, which was "approved for safety standards."

¶ 20    On cross-examination by the guardian *ad litem* (GAL), Powell agreed DCFS was not "any closer today to returning [K.F.] home *** than [they] were two years ago when this case opened." Additionally, Powell believed respondent had not made sufficient progress in services for K.F. to be returned to her custody and it would be unsafe to do so.

¶ 21    2. *Testimony of Respondent*

¶ 22    Respondent testified she was not aware she had to complete a domestic violence education course. Additionally, respondent originally believed counseling was optional. However, when Powell informed her that it was required, she attempted to begin counseling, but the provider told her she "didn't need it." Respondent testified she had transportation issues during the relevant nine-month period. However, respondent acknowledged Powell would offer her rides and give her bus passes. Respondent never told Powell she had issues with riding the bus. K.F. came to respondent's house once a week for one or two hours for visitation. Respondent acknowledged canceling some visits but insisted she was "back and forth from the hospital."

¶ 23    Following respondent's testimony, the GAL recalled Powell as a witness.

¶ 24    3. *Additional Testimony of Powell*

¶ 25    Powell asserted he spoke with respondent multiple times about the required services she had to complete in order to have K.F. returned to her, including completing a domestic violence education course. Respondent also received a copy of every service plan created in this case, which laid out the services she needed to complete.

¶ 26    4. *Trial Court's Ruling*

¶ 27    After hearing arguments from the parties, the trial court found the State had proven

by clear and convincing evidence respondent failed to (1) make reasonable efforts to correct the conditions which were the basis for K.F.'s removal during the relevant nine-month period and (2) make reasonable progress toward the return home of K.F. during the relevant nine-month period. However, the court found the State failed to prove respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to K.F.'s welfare. In its oral ruling, the court highlighted respondent's failure to complete any drug screens, engage in counseling, complete a domestic violence education course, and attend visitation regularly.

¶ 28                                  B. Best Interest Hearing

¶ 29        The trial court held a best interest hearing on February 5, 2026. Prior to any testimony, a copy of the best interest report was admitted into evidence, without objection.

¶ 30        According to the report, K.F. had been in DCFS custody for over 500 days and had lived with her current foster placement for approximately 13 months. When discussing K.F.'s current placement, the report stated, "During the past year, [K.F.] has been able to have what appears to be her first experiences with stability. The result, she has flourished. [K.F.] has made tremendous gains with her current placement because of the stability, love and support they have provided." The report asserted it would be in K.F.'s best interest to remain in her current placement and recommended respondent's parental rights be terminated.

¶ 31        After the admission of the best interest report, the State indicated it had no further evidence to present. Respondent then called Powell as a witness.

¶ 32                                  1. *Testimony of Powell*

¶ 33        Powell acknowledged there appeared to be "some bond" between K.F. and respondent during visits. Additionally, respondent had "continued to ask how [K.F. was] doing during the life of this case."

¶ 34     On cross-examination by the State, Powell stated K.F. was safe and taken care of in her current placement. Additionally, K.F.'s interactions with her foster parents were "[v]ery positive." Based on the interactions he had observed, Powell believed the foster parents were more attentive to K.F.'s needs than respondent. K.F. was secure and loved in her placement, and the foster family was willing to adopt her. Powell believed it would be in K.F.'s best interest for respondent's parental rights to be terminated.

¶ 35                         2. *Trial Court's Ruling*

¶ 36     After hearing arguments from the parties, the trial court found it was in K.F.'s best interest to terminate respondent's parental rights. In its oral ruling, the court discussed the statutory factors it must consider and specifically noted,

> "[K.F.] is safe. She is loved. She's developed ties to the foster parents, foster siblings and their extended family. This child needs permanency. *** The foster parents have given her that permanency and they have confirmed they wish to continue to provide that permanency.
>
> While in their care, this young child has shown great gains in her confidence, in her development both physically and emotionally and she's bonded and developed an identity with the foster family."

The court entered a written order terminating respondent's parental rights.

¶ 37     This appeal followed.

¶ 38                         II. ANALYSIS

¶ 39     On appeal, respondent's counsel moves to withdraw, contending "an appeal in this case would be frivolous." In support of his motion to withdraw, counsel submitted a memorandum of law, which included a statement of facts and arguments as to why respondent's potential claims

lacked merit. In the memorandum of law, counsel evaluated the following claims: (1) whether the trial court erred in finding respondent unfit based on her failure to make reasonable efforts, (2) whether the court erred in finding respondent unfit based on her failure to make reasonable progress toward the return of K.F., and (3) whether the court's best interest finding was against the manifest weight of the evidence. Counsel provided proof of service of his motion and memorandum on respondent, and this court granted respondent the opportunity to file a response. However, respondent did not file a response. After examining the record and counsel's motion to withdraw, we agree with counsel's conclusion there are no issues of arguable merit to be raised on appeal.

¶ 40                                    A. Unfitness Finding

¶ 41          Termination of parental rights under the Juvenile Court Act is a two-step process. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27. Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Pursuant to section 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i)-(ii) (West 2024)), a parent may be found unfit if she fails to "make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected *** minor" or "make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected *** minor." A "parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication" constitutes a failure to make reasonable progress for purposes of section 1(D)(m)(ii). 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 42　　　　　　We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. "This court pays great deference to a trial court's fitness finding because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *In re O.B.*, 2022 IL App (4th) 220419, ¶ 29.

¶ 43　　　　　　In this case, respondent was found to be an unfit parent in that she failed to make reasonable efforts to correct the conditions which led to the removal of K.F. during the relevant nine-month period and she failed to make reasonable progress toward the return of K.F. during the relevant nine-month period. Although respondent was found unfit on two different grounds, we need only address one of the two grounds, as our supreme court has held "[a] parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004). The evidence presented at the fitness hearing demonstrated that respondent failed to complete multiple required services, including drug screens, counseling, a domestic violence education course, and a parenting education course. Although respondent later completed a parenting education course, she completed it after the relevant nine-month period. Based on respondent's failure to complete these services, DCFS was not any closer to returning K.F. to her care, and the caseworker believed it would be unsafe to return K.F. to respondent. Based on this evidence, the trial court did not err in finding respondent failed to make reasonable progress toward the return of K.F. during the relevant nine-month period. Accordingly, we agree with counsel that any argument contesting the court's unfitness finding would be without

merit.

¶ 44                                B. Best Interest Finding

¶ 45        In a proceeding to terminate parental rights, the State must prove termination is in the minor's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367 (2004). When considering whether termination of parental rights would be in the minor's best interest, the trial court must consider the following statutory factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See 705 ILCS 405/1-3(4.05) (West 2024). Although all the statutory factors must be considered, the court is "not required to explicitly reference each factor" in its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 32. This court will not reverse a best interest finding unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Anaya J.G.*, 403 Ill. App. 3d at 883.

¶ 46        In this case, K.F. had been in DCFS custody for 500 days and placed with her

current foster parents for 13 months. According to Powell, K.F. was safe and secure in her foster home and bonded with her foster family. Moreover, the best interest report detailed the developmental and emotional strides K.F. made after being placed in her current foster home. Although Powell testified there was some bond between K.F. and respondent, it was his opinion that the foster parents were more attentive to K.F.'s needs than respondent. It is clear from the evidence presented that K.F. was in a safe and loving foster home and her foster parents were willing to adopt her. Based on this evidence, we agree with counsel that any argument contesting the trial court's best interest finding would be entirely frivolous.

¶ 47                      III. CONCLUSION

¶ 48          For the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 49          Affirmed.